**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JANE DOE CLF F1 AND JOHN DOE CLF F2 | ) | 3:25-CV-1051 (SVN) |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COOPERSURGICAL, INC., | ) | |
| *Defendant*. | ) | |
| | ) | |
| JANE DOE CLF F3 AND JOHN DOE CLF F4 | ) | 3:25-CV-1052 (SVN) |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | March 20, 2026 |
| COOPERSURGICAL, INC., | ) | |
| *Defendant*. | ) | |

**RULING AND ORDER ON DEFENDANT'S MOTIONS TO DISMISS**

Sarala V. Nagala, United States District Judge.

In these two actions, Plaintiffs Jane Doe CLF F1 and John Doe CLF F2 and Jane Doe CLF F3 and John Doe CLF F4[1] sue Defendant CooperSurgical, Inc., alleging that its defective embryo culture media destroyed their embryos during the in vitro fertilization ("IVF") process. Plaintiffs allege that Defendant sold defective embryo culture media, despite its representations that the media provided an optimized environment necessary for fertilized human eggs to develop into embryos viable for implantation. Upon contact with the defective media, Plaintiffs' embryos were compromised and/or damaged such that they were unsuitable for use in conceiving a pregnancy, thereby ruining Plaintiffs' chances of having children through those embryos.

---

[1] The Court granted Plaintiffs leave to proceed pseudonymously.

Plaintiffs brings product liability claims under five theories: (i) strict liability based on manufacturing defect; (ii) strict liability based on failure to warn; (iii) negligence; (iv) gross negligence; and (v) negligent failure to recall. Defendant has moved to dismiss Plaintiffs' complaints. Plaintiffs oppose these motions.

For the reasons discussed below, Defendant's motions in both actions are GRANTED IN PART and DENIED IN PART.

## I.    PROCEDURAL BACKGROUND

The Court presides over five lawsuits concerning Defendant's alleged defective embryo culture media. *See J.G. v. CooperSurgical, Inc.,* 3:25-CV-00172 (SVN) (the "Lead Case"); *D.A. et al v. CooperSurgical, Inc.*, Case No. 3:25-CV-00993 (SVN); *C.A. et al v. CooperSurgical, Inc.*, Case No. 3:25-CV-00995 (SVN); *Doe et al v. CooperSurgical, Inc.*, Case No. 3:25-CV-01051 (SVN) (the "1051 Case"); and *Doe et al v. CooperSurgical Inc.*, Case No. 3:25-CV-01052 (SVN) (the "1052 Case"). The Court consolidated these cases pursuant to Fed. R. Civ. P. 42(a), after finding that they contain significant overlap of factual issues. *See* Order, Lead Case, ECF No. 66.

The Lead Case has since been stayed, pending a decision in a prior pending action in the Northern District of California about whether that case will proceed as a class action, encompassing the plaintiff in the Lead Case. *See* Order, Lead Case, ECF No. 106. Defendant moved to dismiss the complaints in each of the other actions. Shortly before the oral argument on Defendant's motions to dismiss, Plaintiffs in Case Nos. 3:25-CV-993 and 3:25-CV-995 reached confidential settlements with Defendant. Thus, the Court mooted the motions to dismiss in those actions.

At the oral argument on the motions to dismiss in the 1051 and 1052 cases, the Court noted that it intended to vacate its order of consolidation, as no consolidated complaint was filed and the

actions have been proceeding on separate tracks.  Neither the Plaintiffs in those cases nor Defendant objected to this approach.  Thus, the Court vacated its earlier order of consolidation. *See* Order, Lead Case, ECF No. 147.  Each action will proceed separately going forward, though the parties may coordinate on discovery and other matters, where appropriate.

## II.    FACTUAL BACKGROUND

The Court first sets forth the allegations that are common to the complaints in the 1051 and 1052 cases.  As the two complaints are largely identical, the Court primarily cites to the complaint filed in the 1051 Case, but notes where there are material differences between the complaint in that case and the complaint filed in the 1052 Case.  These facts are taken as true for purposes of resolving Defendant's motions to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A.  Shared Allegations

The complaints allege that assisted reproductive technology is a fertility-related treatment in which human eggs, sperm and/or embryos are manipulated to assist with conception.  Compl., 1051 Case, ECF No. 1 ¶ 18.  A common type of assisted reproductive technology is IVF.  *Id.* During the IVF process, eggs are extracted from a woman and fertilized in a laboratory with sperm to create a viable embryo.  *Id.* ¶ 19.  Later in the IVF process, the embryo is transplanted into a uterus.  *Id.*

Embryo culture media plays a pivotal role in the IVF process.  *Id.* ¶ 24.  The media serves as the essential substance in which an egg is immersed, typically in a petri dish, when it is fertilized and during its development in the lab.  *Id.*  Embryo culture media for embryo development is designed to meet the needs of fertilized eggs and embryos by providing, among other things, necessary sources of energy, nutrients, and pH levels based on the specific developmental stage of the embryo.  *Id.* ¶ 25.  Embryo culture media is composed of a salt solution with the addition of other components, such as magnesium, carbohydrates, and amino acids, which are essential for an

embryo's successful growth.  *Id.*  Plaintiffs allege that magnesium, in particular, is required for embryonic development and is a key element to repair mutations during cell division.  *Id.* ¶ 26. Insufficient magnesium levels in embryo culture media can cause embryo growth to arrest and inhibit DNA repair.  *Id.*  After egg retrieval, the embryologist fertilizes the eggs with sperm, and then the fertilized eggs develop to the blastocyst stage in the culture media, which typically occurs over five to seven days.  *Id.* ¶ 27.

Plaintiffs allege that Defendant marketed its embryo culture media for use as the essential culture media in which fertility clinics can fertilize eggs and create the embryos that would develop into future children.  *Id.* ¶ 31.  Defendant also represented that its media was rigorously tested to ensure it was the "highest quality" media available and to ensure that it was not missing key ingredients.  *Id.* ¶¶ 32–33, 35.

On or around December 5, 2023, Defendant issued a recall notice of several lots of its embryo culture media (the "Recalled Embryo Culture Lots").  *Id.* ¶ 42.  The recall notice provided that "CooperSurgical has become aware of a of a sudden increase in complaints regarding the aforementioned lots of this product," acknowledged that the "risk to health is impaired embryo development prior to the blastocyst stage," and directed clinics who purchased the product to quarantine and return it.  *Id.* ¶ 47.  According to regulatory authorities, Defendant issued the recall notice because the Recalled Embryo Culture Lots lacked the critical component of magnesium. *Id.* ¶ 48.  Plaintiffs allege that Defendant had received numerous complaints from fertility clinics regarding impaired embryo development prior to issuing the recall notice.  *Id.* ¶ 43.  And according to Plaintiffs, Defendant knew that improperly manufactured media could damage or compromise embryos upon contact and have significant adverse consequences for the survival outcome of embryos created through IVF and/or harm the children that result from those embryos.  *Id.* ¶ 50.

Plaintiffs allege Defendant also knew that it was vitally important that its media was properly assembled, composed, tested and/or inspected prior to the distribution of such media.  *Id.*

B.  <u>Plaintiffs' Loss of Embryos</u>

1.  *Jane Doe CLF FL and John Doe CLF F2*

Plaintiffs Jane Doe CLF F1 ("F1") and John Doe CLF F2 ("F2") are residents of North Carolina.  *Id.*  ¶¶ 11–12.  In November of 2023, Plaintiff F1 underwent an egg retrieval procedure that successfully yielded 35 eggs, 23 of which were fertilized.  *Id.* ¶¶ 55–56.   By day seven, seven of the embryos had developed to the blastocyst stage; four of those embryos were chromosomally normal, one contained both normal and abnormal chromosomes, and two were not chromosomally normal.  *Id.* ¶¶ 59–60.

In early December of 2023, before learning about the recall of Defendant's culture media, F1 underwent a transfer procedure to transfer one of the embryos, but the embryo did not successfully implant, much to Plaintiffs' disappointment.  *Id.* ¶ 62.  Their fertility doctor later told them that media from the Recalled Embryo Culture Lots was used and was "almost certainly" the cause of the compromised nature of the embryos, and was "likely" the reason that not as many developed to the blastocyst stage as otherwise would have been expected.  *Id.* ¶ 63.  F1 nonetheless attempted another transfer of one of the embryos, but this, too, was unsuccessful.  *Id.* ¶ 64.  Plaintiffs underwent another egg retrieval cycle six months later, resulting in thirteen blastocysts, which they claim "likely would have resulted during the first cycle if not for" Defendant's defective product.  *Id.* ¶ 67.

2.  *Jane Doe CLF F3 and John Doe CLF F4*

Plaintiffs Jane Doe CLF F3 ("F3") and John Doe CLF F4 ("F4") are residents of Iowa. Compl., 1052 Case, ECF No. 1, ¶¶ 11–12.  Plaintiff F3 suffered from longstanding reproductive challenges.  *Id.* ¶ 54.  F3 went through an egg retrieval cycle in mid-November 2023, resulting in

forty-four eggs being retrieved and 32 being fertilized with sperm. *Id.* ¶¶ 55–56. Only five embryos developed to the blastocyst stage, and only three of those were identified as chromosomally normal. *Id.* ¶ 57. Plaintiffs knew that the embryos had been exposed to the recalled culture media, but nonetheless decided to proceed with a transfer in September of 2024, which was ultimately unsuccessful. *Id.* ¶¶ 58–59. On information and belief, Plaintiffs allege that the embryo's exposure to the defective media "contributed to and/or directly caused the transfer to fail." *Id.* ¶ 60.

C. Plaintiffs' Claims

As a result of the alleged events, each set of Plaintiffs bring the following claims:  (i) a strict liability claim based on manufacturing defect; (ii) a strict liability claim based on failure to warn; (iii) negligence; (iv) gross negligence; and (v) negligent failure to recall. Defendant has moved to dismiss the complaints. 1051 Case, ECF No. 23; 1052 Case, ECF No. 23. Plaintiffs oppose these motions. 1051 Case, ECF No. 29; 1052 Case, ECF No. 29.

III. **LEGAL STANDARD**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a case or cause of action for failure to state a claim upon which relief can be granted. When determining whether a complaint states a claim upon which relief can be granted, highly detailed allegations are not required, but the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. This plausibility standard is not a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Id.* In undertaking this analysis, the Court must "draw all reasonable

inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).

The Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008), and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).  Ultimately, determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## IV.    DISCUSSION

Aside from Plaintiffs' specific attempted IVF experiences at their fertility clinics, their complaints are quite similar, setting forth the same basic facts about Defendant's alleged actions (and inaction) and the same five causes of action.  Additionally, Defendant generally makes the same arguments for dismissal of each complaint.  Thus, the Court addresses the sufficiency of both complaints together, and notes below where its analysis relates to only one particular complaint.

The Court holds that Plaintiffs plausibly plead their claims for manufacturing defect, failure to warn, negligence, and negligent failure to recall / post-sale failure to warn under Connecticut law, but fail to plausibly plead gross negligence because it is not an independent cause of action under Connecticut law.  Plaintiffs have also failed to plead an entitlement to punitive damages under the Connecticut Products Liability Act ("CPLA").

7

A.  Choice of Law

As a preliminary matter, the Court notes that Plaintiffs' complaints do not identify the applicable state law or statutes that govern their claims.  The complaints merely spell out several theories of product liability claims, without any detail regarding the legal framework that the Court should apply.  Defendant argued that the complaints should be dismissed for failure to state the governing law.  At the oral argument, after some back-and-forth, Plaintiffs agreed that their claims can be construed as brought under only Connecticut law.[2]  Defendant did not object to application of Connecticut law.  Thus, without engaging in a choice-of-law analysis, the Court applies Connecticut law—specifically, the CPLA—to assess whether any of Plaintiffs' claims should be dismissed.

Under Connecticut law, Plaintiffs' claims are governed by the CPLA, Conn. Gen. Stat. §§ 52-572m *et seq*., which provides the "exclusive remedy" for product liability claims.  *Hunte v. Abbott Lab'ys, Inc.*, 556 F. Supp. 3d 70, 82 (D. Conn. 2021); *Winslow v. Lewis–Shepard, Inc.*, 212 Conn. 462, 471 (1989) ("The legislature clearly intended to make our products liability act an exclusive remedy for claims falling within its scope.").  Although the CPLA contemplates a single cause of action, a plaintiff may "assert various common law theories of liability thereunder." *Hunte*, 556 F. Supp. 3d at 82 (quoting *Phila. Indem. Ins. Co. v. Lennox Indus., Inc.*, No. 3:18-CV-00217 (CSH), 2019 WL 1258918, at *2 (D. Conn. Mar. 18, 2019) ("*Lennox*")).  These theories may include, but are not limited to, strict liability in tort; negligence; breach of express or implied warranty; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; and misrepresentation or nondisclosure, whether negligent or innocent.  *Id.; see also* Conn. Gen. Stat. § 52-572m(b).  Each theory or subclaim brought under the CPLA must sufficiently plead all

---

[2] Had Plaintiffs simply conceded this issue in their briefing, they could have saved significant judicial resources that were expended examining North Carolina and Iowa law in advance of the oral argument.

elements that would be required at common law. *LaMontagne v. E.I. Du Pont De Nemours & Co.*, 41 F.3d 846, 856 (2d Cir. 1994); *see also Lennox*, 2019 WL 1258918, at *2.

Defendant correctly notes that claims brought under the CPLA shall be "in lieu" of all other claims against product sellers, *LaMontagne*, 41 F.3d at 855, such that a plaintiff cannot bring independent common law causes of action for torts covered by the statute. Courts have construed pleadings raising multiple product liability-related claims as advancing a *single* claim supported by multiple theories under the CPLA. *See Leonard v. Gen. Motors L.L.C.*, 504 F. Supp. 3d 73, 92 (D. Conn. 2020) (construing multiple products liability claims as "one claim under the CPLA with multiple theories") (citing *Collazo v. Nutribullet*, 473 F. Supp. 3d 49, 51 (D. Conn. 2020)). The Court proceeds in that manner here and addresses each theory in turn.[3]

B.  Manufacturing Defect (Strict Liability)

First, the Court finds that Plaintiffs have sufficiently pleaded a theory of manufacturing defect under Connecticut law.

"In any Connecticut products liability action, whether brought in strict liability or negligence, 'the plaintiff must plead and prove that the product was defective and that the defect was the proximate cause of the plaintiff's injuries.'" *Lennox*, 2019 WL 1258918, at *3 (quoting *Haesche v. Kissner*, 229 Conn. 213, 218 (1994)); *see also Faux v. Thomas Indus., Inc.*, No. CV-89–0233934-S, 1992 WL 293230 (Conn. Super. Ct. Oct. 8, 1992). A manufacturing defect is a flaw in the manufacturing process which causes the product to deviate from the intended specifications. *Miller v. United Technologies Corp.*, 233 Conn. 732, 779 (1995).

---

[3] Should Plaintiffs choose to amend their complaints in light of the Court's holding with respect to the availability of punitive damages, they may wish to plead a singular CPLA cause of action, with multiple theories, to simplify the pleadings. *See LaMontagne*, 41 F.3d at 855.

The Court rejects Defendant's argument that Plaintiffs' manufacturing defect claims fail because they have not sufficiently alleged a non-conclusory defect and causation.  In making this argument, Defendant primarily relies on *Lennox*, 2019 WL 1258918.  There, the plaintiff brought product liability claims after his property sustained damage due to a fire, which originated from a defective blower motor of a furnace.  *Id.* at *1.  Although the plaintiff identified the source of the defect (i.e., the blower motor), the court dismissed the manufacturing defect claim, finding that plaintiff had not pleaded a *specific* problem with the manufacturing of the product.  *Id.* at *4–5.  Specifically, the court determined that the complaint contained "no facts indicating the specific component or mechanism that was defective, nor has it otherwise identified, even in abstract terms, a particular problem with the subject blower motor."  *Id.* at *4.

The allegations in Plaintiffs' complaint here, on the other hand, are sufficient to plead a manufacturing defect.  First, the complaints clearly identify the source of the defect in the embryo culture media—the lack of magnesium.  1051 Case, ECF No. 1, ¶ 71; 1052 Case, ECF No. 1, ¶ 68. The complaints identify by number the lots that were recalled and cites to Defendant's own recall notice, dated December 5, 2023, which expressly acknowledged a "risk to health" in the form of "impaired embryo development prior to the blastocyst stage."  1051 Case, ECF No. 1, ¶¶ 42–47; 1052 Case, ECF No. 1, ¶¶ 41–46.  Plaintiffs' complaints also alleges that regulatory authorities revealed that the impacted lots were recalled because they "lacked the critical component of magnesium."  1051 Case, ECF No. 1, ¶ 48; 1052 Case, ECF No. 1, ¶ 47.  Plaintiffs further allege that the culture media lots at issue differed from Defendant's "intended result and industry standards" due to "a lack of magnesium and difference(s) in the chemical structure or composition of the Recalled Embryo Culture Lots, such that [the lots] posed a fatal harm to developing human embryos upon their contact with human embryos."  1051 Case, ECF No. 1, ¶ 71; 1052 Case, ECF

No. 1, ¶ 68.  These facts are sufficient to demonstrate that the embryo culture media deviated from its intended specifications, particularly where a recall notice was issued.

Moreover, Plaintiffs plausibly pleads proximate cause based on the alleged manufacturing defect.  The complaints allege that magnesium is a crucial component of embryo culture media, that it is required during the culture process for proper embryonic development and is a key element to repair mutations during cell division, and that media containing insufficient magnesium can cause embryos to arrest and inhibit DNA repair.  1051 Case, ECF No. 1, ¶¶ 25–27; 1052 Case, ECF No. 1, ¶¶ 24–26.  Plaintiffs also allege that Defendant's recall notice warned that the defective lots carried a risk of harm and that the defective, recalled media was used in Plaintiffs' IVF procedures.  1051 Case, ECF No. 1, ¶ 63; 1052 Case, ECF No. 1, ¶ 58.  The complaints further detail various ways that Plaintiffs experienced harm.  And though Defendant contends that Plaintiffs have not plausibly pleaded causation because the complaint contains no facts suggesting that the media (as opposed to some other factor) caused harm to the developing embryos, courts have held that litigants need not allege that the defective product was the *only* cause of their harm, but must merely allege facts showing a plausible connection between the claimed harm and the defect.  *See, e.g., Ferry v. Mead Johnson & Co., LLC*, 514 F. Supp. 3d 418, 444 (D. Conn. 2021); *Fleming v. Garnett*, 231 Conn. 77, 85–86 (1994).  Plaintiffs have done so here.

Thus, Plaintiffs' theory of manufacturing defect survives.

C.  Failure to Warn (Strict Liability)

Next, the Court concludes that Plaintiffs have plausibly pleaded a theory of failure to warn.

"Strict liability applies to failure to warn claims where adequate warnings or instructions were not provided and where the harm suffered would not have occurred had adequate warnings been given."  *Karazin v. Wright Med. Tech., Inc.*, No. 3:17-CV-823 (JBA), 2018 WL 4398250, at

11

*5 (D. Conn. Sept. 14, 2018). In asserting a failure to warn claim, a plaintiff need not plead "detailed factual allegations regarding exactly what instructions should have been provided," as that information might not be available to the plaintiff "prior to discovery." *Id*. Here, Defendant argues that Plaintiffs' failure to warn theory fails because they have not identified what warnings would have been adequate under the circumstances. But Plaintiffs allege that Defendant knew or should have known about risks associated with its defective media prior to Plaintiffs' IVF process, yet failed to provide *any* warnings before the product was used, and that such a timely warning would have prevented the use of the defective media. 1051 Case, ECF No. 1 ¶¶ 78–86; 1052 Case, ECF No. ¶¶ 75–83. The Court finds that these allegations are sufficient to proceed at this stage, despite that they are somewhat conclusory.

The Court further concludes that the learned intermediary doctrine does not bar Plaintiffs' claims. "The learned intermediary doctrine provides, in general terms, that adequate warnings to a prescribing physician obviate the need for a manufacturer of a prescription drug to warn ultimate consumers." *Vitanza v. Upjohn Co.*, 257 Conn. 365, 367 (2001). "The doctrine is based on the principle that prescribing physicians act as learned intermediaries between a manufacturer and consumer and, therefore, stand in the best position to evaluate a patient's needs and assess [the] risks and benefits of a particular course of treatment." *Id.* at 376 (internal citation and quotation marks omitted). Assuming that this doctrine applies in this context, the Court finds that Plaintiffs' allegations that Defendant failed to warn Plaintiffs' fertility providers who "purchased the culture media—prior to use on Plaintiffs' embryos—that the media had not been properly and/or sufficiently tested or inspected, contained compounds and/or a combination of compounds that were harmful to human embryos," 1051 Case, ECF No. 1, ¶ 81; 1052 Case, ECF No. 1, ¶ 78, are sufficient at this stage to demonstrate that the supposed learned intermediaries were not

12

appropriately warned.  Thus, the Court denies Defendant's motion on this basis, without prejudice to renewing this argument after the issue is further developed during discovery.

### D.  Negligence

The Court next concludes that Plaintiffs' negligence claim is plausibly pleaded.

To state a negligence claim in this context, a plaintiff must demonstrate that the defendant owed plaintiff a duty, breach of that duty, proximate causation and damages. *Doran v. GlaxosmithKline PLC*, 607 F. Supp. 3d 192, 205 (D. Conn. 2022).  Defendant argues that Plaintiffs fail to satisfy two of these elements:  causation and damages.

First, the Court finds that Plaintiffs have plausibly pleaded causation for purposes of their negligence claim, for the same reasons discussed in the manufacturing defect section above.

Second, the Court need not reach the legal issue of whether damaged or compromised embryos constitute a compensable injury.  At this stage, Plaintiffs allege that their embryos were compromised and/or damaged as a result of Defendant's defective media.  Accepting these allegations as true, the Court assumes—without deciding—that such allegations are sufficient to demonstrate that Plaintiffs' property suffered harm.

Third, even if embryos can be construed as property, the economic loss doctrine does not bar Plaintiffs' negligence claim.  The economic loss doctrine generally bars negligence claims "that arise out of and are dependent on breach of contract claims that result only in economic loss." *Ulbrich v. Groth*, 310 Conn. 375, 410 (2013); *Mountain W. Helicopter, LLC v. Kaman Aerospace Corp.*, 310 F. Supp. 2d 459, 467 (D. Conn. 2004); *Reynolds, Pearson & Company, LLC v. Miglietta*, No. CV-000801247, 2001 WL 418574, at *3 (Conn. Super. Ct. Mar. 27, 2001) ("[t]he economic loss doctrine is a judicially created doctrine which bars recovery in tort where the relationship between the parties is contractual and the only losses alleged are economic").  Here,

there is no suggestion in the complaint that the parties were in privity or otherwise had a contractual relationship.  And when a plaintiff alleges property damage beyond purely economic loss, the economic loss doctrine does not apply.  *Mountain W. Helicopter, LLC*, 310 F. Supp. 2d at 467 (citing *Shoreline Care LP v. Jansen & Rogan Consulting Engineers, P.C.*, No. X-06-CV-940155982-S, 2002 WL 173155, at *2 (Conn. Super. Ct. Jan. 9, 2002)).  Accordingly, the Court concludes that the economic loss doctrine does not bar Plaintiffs' claims.

### E.  Gross Negligence

Next, the Court concludes that Plaintiffs' theory of liability based on gross negligence fails under Connecticut law, which Plaintiffs conceded at oral argument.  Connecticut does not recognize degrees of negligence and, consequently, does not recognize the tort of gross negligence as a basis of liability.  *Hanks v. Powder Ridge Restaurant Corp.*, 276 Conn. 314, 337 (2005).  Count Four is therefore dismissed.

### F.  Failure to Recall

The Court finds that Plaintiffs may pursue a failure to recall theory under Connecticut law.

Defendant argues that Plaintiffs' failure to recall theory fails because it is unclear whether Connecticut recognizes a failure to recall claim.  The allegations in the "failure to recall" section of the complaints read as a breach of a post-sale duty to warn, as they focus on Defendant's failure to warn Plaintiffs' fertility clinic when it first learned about the defective media.  1051 Case, ECF No. 1 ¶¶ 106–115; 1052 Case, ECF No. 1, ¶¶ 103–112.

A "post-sale duty to warn" theory is valid under Connecticut law.  *Savage v. Scripto-Tokai Corp.*, 266 F. Supp. 2d 344, 351 (D. Conn. 2003) ("Inasmuch as a claim of breach of the post-sale duty to warn is analogous to a claim of failure to recall, plaintiffs' theory has legal viability in Connecticut."); *Densberger v. United Techs. Corp.*, 297 F.3d 66, 71 (2d Cir. 2002) ("Because the

14

CPLA does not expressly prohibit post-sale liability for negligent failure to warn," it is cognizable under the CPLA).  Defendant cites to *Simoneau v. Stryker Corp.*, No. 3:13-CV-1200 (JCH), 2014 WL 1289426, at *13 (D. Conn. Mar. 31, 2014) for the proposition that a post-sale duty to warn is not cognizable in Connecticut.  But that case does not stand for that proposition.  Rather, in *Simoneau*, the court observed that, in *Densberger*, the Second Circuit held that such a claim can exist in negligence, not under strict liability.  *Id.* at *13 n.11.  As Plaintiffs' failure to recall / post-sale duty to warn theory here is *not* brought as a strict liability claim, *Simoneau* does not preclude it or otherwise indicate that a post-sale duty to warn theory is not cognizable under Connecticut law.

G.  Damages

Finally, the Court finds that Plaintiffs' request for "exemplary" damages—known as punitive damages in Connecticut—is not plausibly pleaded.

Under the CPLA, punitive damages "may be awarded if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product."  Conn. Gen. Stat. § 52-240b; *see also Hunte*, 556 F. Supp. 3d at 90.  Under the statute, punitive damages may not exceed "an amount equal to twice the damages awarded to the plaintiff."  Conn. Gen. Stat. § 52-240b.

Importantly, under Connecticut law, "[r]ecklessness is more than negligence, more than gross negligence."  *Northrup v. Witkowski*, 175 Conn. App. 223, 248 (2017).  It requires "highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is present."  *Id.* (quotation omitted).  Here, Plaintiffs assert claims for negligence and gross negligence, but the reckless disregard required to sustain a request for punitive damages entails more than mere negligence or even gross negligence.  *See id.*

15

The Court recognizes that Plaintiffs describe Defendant's failure to test and inspect the recalled culture media prior to distribution as "reckless" and under taken with "conscious disregard for the safety of consumers and/or users" in their now-dismissed gross negligence claims.[4]  *See* 1051 Case, ECF No. 1, ¶¶ 102, 104; 1052 Case, ECF No. 1, ¶¶ 99, 101.  But these allegations are highly conclusory and do not meaningfully distinguish how Defendant's alleged actions went beyond mere negligence.  Finally, Connecticut Superior Courts have suggested that plaintiffs should bring a separate claim for "reckless disregard and punitive damages" under the CPLA.  *See Castle v. Boehringer Ingelheim Pharmaceuticals, Inc.*, No. X-08196041722-S, 2020 WL 6712426, at *6 (Ct. Super. Ct. Sept. 2, 2020).

Thus, the Court holds that Plaintiffs' complaints do not presently support a request for punitive damages under Connecticut law.

## V.   CONCLUSION

For the reasons described herein, Defendant's motions to dismiss, ECF No. 23 in the 1051 Action and ECF No. 23 in the 1052 Action, are GRANTED IN PART with respect to Plaintiffs' requests for punitive damages and gross negligence claims, and DENIED IN PART in all other respects.  Plaintiffs may amend their complaints by **April 9, 2026**.  Additionally, by **May 7, 2026**, the parties shall meet and confer and file a Rule 26(f) report in both actions, setting forth proposed deadlines.

**SO ORDERED** at Hartford, Connecticut, this 20th day of March, 2026.

 */s/ Sarala V. Nagala*
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE

---

[4] Plaintiffs also describe Defendant's failure to test the recalled media as "reckless" in their negligence claims, which have survived dismissal.  1051 Case, ECF No. 1, ¶ 91; 1052 Case, ECF No. 1, ¶ 89.